## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

BRENTON BENSON,
REGAN BENSON,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, a municipality,
JOHN SCHAAL, in his individual capacity,
F/N/U COURIER, in his individual capacity,
F/N/U ALLEN, in her individual capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their counsel, Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby submit their Complaint and Jury Demand, and state as follows:

## **INTRODUCTION**

1.     Denver Police Department ("DPD") officers retaliated against Plaintiff Brenton Benson and, his wife, Plaintiff Regan Benson because Mrs. Benson was filming their actions, Mrs. Benson is a known critic of the DPD and its response to the homelessness crisis, and both Mr. and Mrs. Benson were critical of them. When Mr. and Mrs. Benson saw multiple police officers hanging out in a private parking lot, they pulled over to the side of the road and parked and Mrs. Benson then began filming the officers from their car. Because the officers did not appreciate being scrutinized, and because they wanted to personally retaliate against Mrs.

Benson who they knew was a longtime critic of the police and their response to the homelessness crisis, Defendants Schaal, Courier, and Allen conspired to retaliate against Mr. and Mrs. Benson. They concocted a plan to cite Mr. Benson for blocking the roadway, which was obviously bogus, to intimidate Mr. and Mrs. Benson and punish them for engaging in First Amendment-protected activity. After giving Mr. Benson a bogus citation for allegedly blocking the roadway, the officers left Mr. Benson parked in the exact same spot they claimed was blocking the roadway. This was just the first indication that the only basis for the charges levied against Mr. Benson was retaliation.

2.      At a later Court date, a Denver County court judge found that Defendants had no basis to cite Mr. Benson and summarily dismissed the charges. Despite the fact that he had been caught red-handed, Defendant Schaal continued his retaliatory actions. Defendant Schaal hid from the judge, and Mr. Benson, that he had placed a hold on Mr. Benson's driver's license because of the citation that required him to re-test in order to keep an active license. Because Mr. Benson did not know about this hold, his license expired. He later found out that Defendant Schaal took these retaliatory actions and was forced to miss multiple days of work while he sorted out renewal of his driver's license.

3.      This is not the first time that DPD officers have retaliated against individuals for filming the police. In fact, DPD has a long, sordid history of violating the First Amendment. And, that is no surprise given that no Defendant was disciplined for their actions here, and Denver officers repeatedly face no repercussions for their violation of Denver citizens constitutional rights. Plaintiffs bring this action to hold Denver, and its officers, accountable because Denver refuses to do so.

## JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

5.      Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

7.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## PARTIES

8.      At all times relevant to this Complaint, Plaintiff Brenton Benson was a citizen of the United States of America and a resident of the State of Colorado.

9.      At all times relevant to this Complaint, Plaintiff Regan Benson was a citizen of the United States of America and a resident of the State of Colorado.

10.     At all times relevant to this Complaint, Defendant John Schaal was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Schaal was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Schaal is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

11.     At all times relevant to this Complaint, Defendant F/N/U Courier was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Courier was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Courier is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

12.     At all times relevant to this Complaint, Defendant F/N/U Allen was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Allen was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer for DPD. Defendant Allen is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

## FACTUAL ALLEGATIONS

13.     On August 22, 2021, Mr. and Mrs. Benson were driving near the 800 block of South Huron in Denver, Colorado. Mr. and Mrs. Benson observed three DPD officers who were parked on private property. Mr. Benson stopped his vehicle on the side of the road and placed it into park. While Mr. Benson did that, Mrs. Benson pulled out her phone to begin recording the officers.

14.     Mrs. Benson is a known homelessness advocate in DPD District Four and officers in District Four know her for her advocacy. Ms. Benson has been repeatedly targeted by DPD officers, through arrests, harassment, and intimidation, because she regularly criticizes DPD officers and films them in the performance of their duties. Specifically, DPD District Four officers know Ms. Benson because she continuously interacts with them during homeless sweeps

along the South Platte River. Ms. Benson is an outspoken critic of these sweeps and the police response to homelessness.

15.    DPD Officer John Schaal noticed that Mrs. Benson was recording, drove his vehicle up to Mr. Benson's car, and asked if everything was ok. Mrs. Benson responded that she was just checking to see if everything was ok for the officers. Defendant Schaal rudely interrupted Mrs. Benson and snidely told her to have a good day while aggressively pulling away. Defendant Schaal knew who Mrs. Benson was from the moment he drove up to Mr. Benson's vehicle and saw her filming the officers.

16.    Defendant Schaal then pulled back alongside the other officers on the private property. Upon information and belief, Defendant Schaal told the other officers that Mrs. Benson and her husband were filming them. The officers began conspiring to try to find a reason to retaliate against Mr. and Mrs. Benson. The officers decided that falsely accusing Mr. Benson of being parked illegally and blocking the roadway was the pretext that they would use to issue Mr. Benson a citation in retaliation for his wife's protected First Amendment activity.

17.    After two minutes, Defendant Schaal stepped out of his vehicle and approached Mr. Benson's vehicle. Immediately, Defendant Schaal asked Mr. Benson if there was a reason he was in the middle of the roadway and blocking traffic, despite it being obvious to Defendant Schaal that Mr. Benson was not in the middle of the roadway nor blocking traffic but was instead pulled off to the side of the road. Mr. Benson began to criticize Defendant Schaal and informed him that he was not blocking the street. After Mr. Benson's criticism, Defendant Schaal became more determined to retaliate against Mr. and Mrs. Benson.

18.     Defendant Schaal took down Mr. Benson's license plate and returned to his vehicle. Once Defendant Schaal returned to his vehicle, he aggressively whipped it around, pulled an illegal U-turn across the roadway, and parked immediately behind Mr. Benson's truck.

19.     At this point, Defendants Courier and Allen approached Mr. Benson's vehicle and watched Defendant Schaal interact with Mr. and Mrs. Benson.

20.     After parking behind Mr. Benson's truck, Defendant Schaal approached Mr. Benson and again told him that he was illegally blocking the roadway (which was not true). Mr. Benson was again critical of Defendant Schaal and told him that he was not blocking the roadway. Mr. Benson's criticism irritated Defendant Schaal and Defendant Schaal asked for Mr. Benson's identification, insurance, and registration. Mr. Benson provided all of these things to Defendant Schaal.

21.     Defendant Schaal proceeded to write Mr. Benson a citation for allegedly violating D.R.M.C. 54-160 in retaliation for Mr. Benson's advocacy and. In retaliation, Defendant Schaal also placed a note in the Department of Motor Vehicle System indicating that the citation required Mr. Benson to re-test for his driver's license. Defendant Schaal never told Mr. Benson this because he knew that it would cause Mr. Benson's license to be suspended.

22.     While Defendant Schaal was taking all of the above-described actions, Defendants Courier and Allen stood by and did nothing to intervene. All of the Defendants conspired together to violate the rights of Mr. and Mrs. Benson.

23.     After giving Mr. Benson a citation, the officers left the scene. When they left the scene, they did not make Mr. Benson move his vehicle. Given that they allowed Mr. Benson's

vehicle to remain in the roadway, it was clear that his vehicle was not blocking the roadway and that their citation was just a pretextual reason for their retaliation against Mr. and Mrs. Benson.

**A judge finds Mr. Benson not guilty and that the real reason for his citation was his and Mrs. Benson's speech.**

24.     A few months later, on November 17, 2021, Mr. Benson appeared in Denver County Court to contest his ticket. Defendant Schaal appeared in support of the ticket. During the hearing both Mr. Benson and Defendant Schaal testified and Denver County Magistrate Judge Catherine Cary presided.

25.     After both parties testified, Judge Cary ruled from the bench. She made a finding that Defendant Schaal used the municipal ordinance as a pretext to retaliate against Mr. and Mrs. Benson. The judge also found that there was no basis for the charges.

26.     The judge went on to find that Mr. Benson was not guilty of impeding traffic in violation of D.R.M.C. 54-160.

**Mr. Benson suffers further damages from the DPD officers' retaliatory actions.**

27.     Almost one month later, Mr. Benson was driving on Interstate 70 westbound through Idaho Springs. A state trooper pulled him over for allegedly speeding (this ticket was ultimately dismissed by a Clear Creek County judge in February of 2022). The state trooper that pulled Mr. Benson over informed him that his license had been suspended because of the re-test requirement placed on his license by Defendant Schaal. Mr. Benson was given a ticket not only for speeding, but also for driving under suspension. The state trooper destroyed Mr. Benson's license and Mr. Benson was required to go to the Department of Motor Vehicles to get a new license.

28.     Mr. Benson's ticket for driving under suspension was dismissed after he provided the Clear Creek County Court with a certified copy of his driving record along with his driver's license (which he had to get reinstated). As a result, Mr. Benson lost approximately three days of work.

**Denver as an informal custom or practice of condoning unlawful arrests and other acts of retaliation by its officers that is based solely on the exercise of First Amendment rights.**

29.     Denver has a history of retaliating against individuals who record and are critical of police officers—an issue that should have long since been addressed by Denver. A number of previous, similar incidents demonstrate that, at the time of the incident involving Mr. and Mrs. Benson, there was a formal or informal custom and practice, that was known to Denver, of retaliating against individuals who record police officers, and of condoning this retaliation. The following analogous incidents show that this informal custom and practice was widespread, and that Denver has consciously decided to stop this informal custom and practice from existing within the DPD.

30.     All of the acts described herein were done by Defendants were intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Plaintiffs' federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Denver acting under color of state law.

31.     Defendants' treatment of Plaintiffs was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to: (1) retaliating against individuals who criticize police officers and (2) retaliating against individuals who film police

officers in the performance of their duties. These widespread customs and practices have borne

out over the years in repeated retaliation by Denver officers against individuals who film and/or

criticize the police with no disciplinary action. This has led to Defendant Denver sending a clear

and unequivocal message to its officers that retaliation against those who criticize and/or film the

police is acceptable and tolerated by Defendant Denver.

32.     The following are examples of Denver police officers violating individuals First

and Fourth Amendment rights without repercussion, and of Denver officers engaging in this

unconstitutional conduct pursuant to the customs and practices of Defendant Denver.

33.     On August 14, 2014, Levi Frasier witnessed DPD officers punch an unarmed

civilian numerous time in the head and trip a heavily pregnant woman, causing her to fall to the

ground. Believing the officers were committing illegal acts of misconduct, Mr. Frasier video-

recorded the officers with his tablet. Upon seeing Mr. Frasier recording, DPD officers

surrounded Mr. Frasier, threatened him with arrest, and demanded he turn over his video. Mr.

Frasier refused, and a DPD officer seized his tablet from him and searched it illegally. On the

plaintiff's motion to reconsider, Judge Blackburn of the U.S. District Court for the District of

Colorado reinstated the plaintiff's First Amendment retaliation claims against the officer

defendants and granted Denver's motion for summary judgment. Despite Denver's policy and

training on the First Amendment, the officers nonetheless violated Mr. Frasier's First

Amendment right to gather and record information on matters of public concern. Denver never

disciplined the officers for their unconstitutional actions.

34.     On January 26, 2015, DPD officer threatened a witness who was attempting to

file the aftermath of the DPD shooting of Jessica Hernandez. That witness tried to video-record

the officers' actions in public while she was standing on her own property. DPD officers ordered her not to record. The DPD officers who engaged in this blatantly unconstitutional conduct were not disciplined in any way.

35.    On the morning of May 23, 2018, DPD officers arrested Elijah Wesbrock for using a video camera and mobile phone to record police conduct. After unlawfully arresting him, the DPD officers pushed Mr. Wesbrock against their vehicle and proceeded to illegally search him. After searching Mr. Wesbrock, they forced him into the back of their vehicle. DPD officers arrested and searched Mr. Wesbrock in retaliation for him recording public places. Denver never disciplined the officers for their unconstitutional actions. Mr. Wesbrock filed a federal lawsuit and Denver paid Mr. Wesbrok $80,000 to settle his claims.

36.    On September 23, 2018, Brian Loma and Mikel Whitney were protesting the police in downtown Denver. During his protest, Mr. Loma shouted, "fuck the police!" Upon hearing these words, DPD officers began contemplating whether Mr. Loma should be arrested for disturbing the peace. When Mr. Loma's shouting and profanity annoyed the sensibilities of a couple dining on a nearby restaurant patio that protrudes onto the public sidewalk, Denver officers used the couples' complaint to, within minutes, arrest and jail Mr. Loma for his protected speech. Mr. Whitney observed Mr. Loma's protest and subsequent arrest. As a concerned citizen and friend of Mr. Loma's, Mr. Whitney took photos of the incident, believing the officers were committing illegal acts in retaliation against Mr. Loma for his protected speech. In his effort to gather information about the officers' misconduct, Mr. Whitney unsuccessfully attempted to take a photo of the complaining couple and their surroundings while standing on a public sidewalk from several yards away. This upset a few Denver officers, who demanded Mr.

Whitney not take pictures. Mr. Whitney calmly stated that he did not take a picture and that he was walking away. One officers retorted that Mr. Whitney was indeed going to walk away because the couple was ready to sign a complaint against him as well. As Mr. Whitney walk away, he stated, "I did not take a fucking picture." Upon hearing Mr. Whitney's statement, two of the Denver officers immediately arrested Mr. Whitney. While arresting him, Defendant Guzman told him to quit swearing. Denver officers unconstitutionally retaliated against Mr. Loma and Mr. Whitney because they were criticizing the police and, Mr. Whitney, because he was taking photographs of them in the performance of their duties. Denver never disciplined the officers for their unconstitutional actions. Mr. Whitney and Mr. Loma filed a federal lawsuit and they settled their claims against Denver for $128,000.

37.    On September 23, 2018, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the property, and instead, officers arrested her in retaliation for engaging in First Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Ms. Sodaro's arrest was unconstitutional and in retaliation for her engaging in First Amendment protected activity. Denver never disciplined the officers for their unconstitutional actions.

38.    On September 24, 2018, Eric Brandt was in the Sixteenth Street Mall protesting their arrests. Mr. Brandt stood on a public sidewalk and shouted, "we want justice for Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!" Multiple Denver officers were

11

present and closely watching Mr. Brandt. One officer expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." A woman standing nearby stated that she was offended and would sign a complaint. The officers then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018. Mr. Brandt's arrest was clearly unconstitutional and undertaken in retaliation for him criticizing the police. Denver never disciplined the officers for their unconstitutional actions. Mr. Brandt filed a federal lawsuit and Mr. Brandt settled his claims against Denver for $65,000.

39.     On July 5, 2018, Susan Greene, a journalist, was driving to the bank when she saw a black man handcuffed and naked on the sidewalk across from the State Capitol Building surrounded by DPD officers. Concerned as a public citizen and journalist by the questionable appearance of an African-American man unclothed, unthreatening, and in handcuffs, Ms. Greene parked her vehicle and began to take pictures on a public sidewalk where she was not obstructing police investigation. DPD officers told her to stop. Ms. Greene stated that it was a public sidewalk and that she had the right to take photos. The officers falsely accused Ms. Greene of violating the arrestee's HIPAA rights and of blocking the door to an ambulance. The officers then forcefully and painfully arrested Ms. Greene in retaliation for exercising her First Amendment right to photograph the police on a public sidewalk, and handcuffed her for ten minutes before releasing her. Ms. Greene was never charged with a crime. Ms. Greene's First Amendment, First Amendment retaliation, and Fourth Amendment excessive force claims

against Denver and DPD officers were settled in August 2019 for $50,000. Denver never disciplined the officers for their unconstitutional retaliation against Ms. Greene.

40.     On July 15, 2019, multiple DPD officers violated the First Amendment rights of Natalie Kantor by retaliating against her for criticizing and recording them in the public performance of their duties. Ms. Kantor was in a car that was pulled over by DPD officers on suspicion that the driver was driving under the influence. DPD officers performed a field sobriety test of the driver then, without warning, attempted to arrest the driver. The officers took him to the ground. When they did, Ms. Kantor exited the car to see what was happening. She then stood on a public sidewalk and criticized the officers actions and recorded the arrest on her cell phone. For that, DPD officers arrested her. The driver was ultimately acquitted of DUI. Despite this, no DPD officer was disciplined for their unconstitutional actions toward Ms. Kantor. Ms. Kantor filed a federal lawsuit and Denver paid $100,000 to settle Ms. Kantor's claims.

41.     On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the plaintiffs' First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the plaintiffs' First and Fourth Amendment rights and issued a temporary restraining order to enjoin

13

Denver and DPD from employing chemical weapons or projectiles of any kinds against persons engaging in peaceful protest. Denver never disciplined the officers for their unconstitutional actions.

42.     On May 28, 2020, Michael Acker, a young black college student, was peacefully protesting in a march that was criticizing DPD officers. At one point during the protest, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a Kinetic Impact Projectile ("KIP") at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. None of the officers involved were disciplined for their unconstitutional actions. Mr. Acker filed a federal lawsuit and Denver paid Mr. Acker $500,000 to settle his claims.

43.     On May 28, 2020, while he was covering the protests rally at the State Capitol. Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel under the control of the DPD while he was photographing police conduct. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it

was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me." None of the officers involved were disciplined for their unconstitutional actions.

44.     On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP while he was at a protest criticizing DPD officers. Mr. Thorn is a veteran who served in the United States Armed Forces. Several times while Mr. Thorn was attempted to assist other injured people, DPD officers targeted him and shot pepper balls. While at the protest, Mr. Thorn observed a largely peaceful protest but saw DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time. None of the officers involved were disciplined for their unconstitutional actions.

45.     On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was recording them, shot him in the chest with a pepper ball. None of the officers involved were disciplined for their unconstitutional actions.

46.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol criticizing DPD officers. When DPD officers shot her in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance. None of the officers involved were disciplined for their unconstitutional actions. Ms. Matthews filed a federal lawsuit and Denver paid Ms. Matthews $575,000 to settle her claims.

47.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7 was struck four times in the chest by KIPs fired by DPD officers while the cameraman was recording police conduct. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level. None of the officers involved were disciplined for their unconstitutional actions.

48.     On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round by DPD officers while standing beside a professional cameraman from that station who was recording police conduct. The round struck Mr. Jojola's backpack. None of the officers involved were disciplined for their unconstitutional actions.

49.     On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer, was standing in a group of press photographers recording police conduct when a DPD officer kicked a pepper gas canister directly into her face. None of the officers involved were disciplined for their unconstitutional actions.

50.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with pepper balls without warning while he attended a protest rally criticizing DPD officers. Mr. McDonald was simply peacefully attending the protest when he was shot without warning. None of the officers involved were disciplined for their unconstitutional actions.

51.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a pepper ball without warning while she was attending a protest that criticizing DPD officers. DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face. None of the officers involved were disciplined for their unconstitutional actions. Ms. Epps was awarded $1,000,000 by a jury of her peers for the DPD officers violation of her First and Fourth Amendment rights.

52.     On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a rubber bullet without warning because they perceived he was attending a protest that was criticizing DPD officers. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. His friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. None of the officers involved were disciplined for their unconstitutional actions.

53.     On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a pepper ball without warning while he was attending a protest criticizing DPD officers. After being shot, he was taken to the emergency room. None of the officers involved were disciplined for their unconstitutional actions.

54.     On May 30, 2020, Mercii Thomas was shot in the head with a rubber bullet by DPD officers without warning while she attended a protest criticizing DPD officers. Ms. Thomas joined the peaceful protests that had been happening in Denver since the video of the brutal police murder of George Floyd had been released a few days earlier. As Ms. Thomas was protesting, she looked around her and was horrified to see the police firing pepper balls and rubber at protesters who were lying on the ground. She began filming the police violence against peaceful protesters with her phone. As she did so, she observed other people who were recording with their phones being targeted with rubber bullets and pepper balls. It occurred to her that filming the police could be making her a target too. Suddenly, Ms. Thomas felt a massive blow to her forehead. Everything went black as she fell to the ground and lost consciousness. As she regained consciousness, she found herself being picked up and taken to a curb by medics. She lay on the ground bleeding profusely from her head while the medics worked on applying a tourniquet. Then she felt a sudden burst of pain on her lower back side and realized she had been hit by police again, this time with a pepper ball. Ms. Thomas was terrified, bleeding on the ground, and still police were targeting her with projectiles. She eventually received medical care for her injuries. None of the officers involved were disciplined for their unconstitutional actions. Ms. Thomas filed a federal lawsuit and Denver paid $500,000 to settle Ms. Thomas' claims.

55.     On May 30, 2020, DPD officers shot Darrell Hampton in the face with a pepper ball without warning. Mr. Hampton was peacefully protesting, and filming, DPD officers on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers. None of the officers involved were disciplined for their unconstitutional actions. Mr. Hampton filed a federal lawsuit and Denver paid $175,000 to settle Mr. Hampton's claims.

56.     On May 31, 2020, Gabe Schlough was shot in the face with a rubber bullet by DPD officers without warning while he was attending a protest criticizing DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. Officers were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with rubber bullets. Mr. Slough described the sensation as getting hit with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The rubber bullet had left a gaping wound on his chin, and blood was pouring down onto the front of

his shirt. Mr. Slough went to the hospital where he required twenty-two stitches to close the

wound on his chin. He still experiences pain from this wound and required plastic surgery for it

to heal properly. None of the officers involved were disciplined for their unconstitutional actions.

Mr. Schlough filed a federal lawsuit and Denver paid $575,000 to settle Mr. Schlough's claims.

57.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with

pepper balls without warning while he attended a protest criticizing DPD officers. Mx. Amghar

was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting,

"Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There

was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone

else not near them in the crowd threw a water bottle at the officers. The DPD officers

immediately began shooting into the crowd with pepper balls. They did this without warning or

giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the

crowd moved back, they began shooting directly at Mx. Amghar, even though they were

standing still with their hands up. The DPD officers first shot them in the arms and legs, then in

the chest, and then directly in the face, even though they continued standing still with their hands

up. The DPD and/or APD officers shot them approximately fourteen times. The DPD officers did

not give any orders before, during, or after this incident. No one told Mx. Amghar to move back

or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on

them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you

doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple

minutes, Mx. Amghar walked away and took cover behind a tree. None of the officers involved

were disciplined for their unconstitutional actions. Mx. Amghar filed a federal lawsuit and Denver paid $250,000 to settle Mx. Amghar's claims.

58.    On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by DPD officers and shot in the head and abdomen with pepper balls while covering a protest that criticized DPD officers. He sustained a contusion on his head and right abdomen. None of the officers involved were disciplined for their unconstitutional actions.

59.    On May 31, 2020, DPD officers shot Darian Tindall in the chest with pepper balls without warning while attending a protest criticizing DPD officers. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD. None of the officers involved were disciplined for their unconstitutional actions.

60.    On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning while Mr. Cruz was attending a protest criticizing DPD officers. As a photographer and freelance journalist, Mr. Cruz documented the protests as well as the police response. As he was doing so, one DPD officer shot Mr. Cruz in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have

happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not

open his eye. A month after the attack, he still has light sensitivity and other problems with his

eyesight. None of the officers involved were disciplined for their unconstitutional actions.

61.     On June 1, 2020, members of the Colorado Freedom of Information Coalition,

Colorado Press Association Network, Colorado Broadcasters Association, and Colorado Pro

Chapter of the Society of Professional Journalists reported seven journalists or reporters had

been subjected to the use of force by DPD officers while filming police conduct in Denver. DPD

officers hit these reporters and with pepper balls, projectiles, or tear gas simply for being present

at protests that were criticizing DPD officers and documenting (through filming and

photography) their brutal actions.

62.     On June 4, 2020 four persons who participated in the George Floyd protests in

Denver sued Denver, alleging that DPD officers' actions violated the First and Fourth

Amendments. After a hearing on the matter, Judge R. Brooke Jackson of the United States

District Court for the District of Colorado issued a temporary restraining order. In doing so,

Judge Jackson reminded the DPD that "people have an absolute right to demonstrate and protest

the actions of governmental officials, including police officers. It is one of the many freedoms on

which this country was built." In response to the evidence presented, Judge Jackson was

unequivocal about the behavior of DPD officers toward protesters who criticized them, calling it

"disgusting." Judge Jackson went on to conclude that there was a "strong likelihood" that DPD

officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson

made this determination based on video evidence that showed "police conduct at the

demonstrations" where "the officers had ample time for reflection and were not dealing with

dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

**Defendant Denver's unconstitutional customs and practices caused the violation of Mr. and Mrs. Benson's constitutional rights.**

63.     Defendants' unlawful conduct, as set forth in detail herein, was in accordance with the above-described customs and practices condoned and ratified by Defendant Denver that were, even if not authorized by written law or express municipal policy, so permanent and well established as to constitute a custom or usage with the force of law.

64.     Defendant Denver's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of their violation of Mr. and Mrs. Benson's constitutional rights.

65.     Defendant Denver's policies, customs, or practices in failing to properly train and/or supervise its employees were the moving force and proximate cause of the violation to Mr. and Mrs. Benson's constitutional rights.

66.     The customs, policies, and practices of Defendant Denver of encouraging, condoning, tolerating, and ratifying the retaliation against those who record at public places or criticize public officials, as described herein, was the moving force behind, and proximate cause of, the violation to Mr. and Mrs. Benson's constitutional rights.

67.    The actions of Defendant Denver as described herein deprived Mr. and Mrs.

Benson of the rights, privileges, liberties, and immunities secured by the Constitution of the

United States of America and caused her other damages.

68.    The acts or omissions of Defendant Denver caused Mr. and Mrs. Benson damages

in that she suffered physical and mental pain, among other injuries, damages, and losses.

**Defendant Denver was deliberately indifferent to its unconstitutional customs and practices.**

69.    Through Defendant Denver's continuous ratification of its officers'

unconstitutional conduct, as described above, Defendant Denver has condoned the conduct of its

officers and sent the message that it will not discipline them for violating the Constitution.

70.    Defendant Denver knew or had constructive knowledge, based on the customary

actions of its officers described above and its condoning of those actions, that its officers would

retaliate against those who criticized and/or recorded the police, like Mr. and Mrs. Benson.

71.    Defendant Denver could have and should have pursued reasonable methods for

prohibiting the widespread customs and practices outlined above, but affirmatively chose not to

do so by refusing to discipline its officers who unconstitutionally retaliated against those

exercising their First Amendment rights.

72.    Defendant Denver could have and should have pursued reasonable methods for

disciplining its officers to make clear that it does not condone such constitutional violations, but

failed to do so.

73.    Defendant Denver knew, or should have known, that its employees would

retaliate against Mr. and Mrs. Benson for recording police activity and speaking critically of

police officers, thereby violating Mr. and Mrs. Benson's constitutional rights.

74.    Defendant Denver was deliberately indifferent to Mr. and Mrs. Benson's constitutional rights, because Defendant Denver knew that individuals in Mr. and Mrs. Benson's position would be at a substantial risk of suffering dangerous consequences from Defendant Denver condoning and establishing the multiple unconstitutional customs and practices outlined above.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation
### Free Speech
*Plaintiffs Against All Defendants*

75.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

76.    At all times relevant to this Complaint, Defendants were acting under the color of law.

77.    Plaintiffs were engaged in protected speech.

78.    Plaintiffs' speech was on a matter of public concern and did not violate any law.

79.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech rights.

80.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiffs' speech.

81.    Plaintiffs' speech occurred at a traditional public forum.

82.    Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

83.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiffs.

84.    Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

85.    Defendant Denver was aware of widespread retaliation by its law enforcement officers against those exercising First Amendment rights, as detailed above, and failed to properly discipline its employees for retaliation.

86.    Defendant Denver knew, or should have known, that its employees would retaliate against those exercising First Amendment rights and would retaliate in arresting Plaintiff, violating his constitutional rights.

87.    Defendant Denver's customs and practices condoning its employees' retaliation were the moving force and proximate cause of the violation to Plaintiff's constitutional rights.

88.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment
### Retaliation
*Plaintiffs Against All Defendants*

89.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

90.    At all times relevant to this Complaint, Defendants were acting under the color of law.

91.    Plaintiffs were engaged in protected speech.

92.    Plaintiffs' speech was on a matter of public concern and did not violate any law.

93.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech rights.

94.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiffs' speech.

95.    Plaintiffs' speech occurred at a traditional public forum.

96.    Defendants responded to Plaintiffs' protected speech activity with retaliation.

97.    Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their free speech rights.

98.    Defendants sought to punish Plaintiffs for exercising their free speech rights, to silence their future speech, to stop them from continuing to speak, and to restrict their freedom of expression, along with the future speech and expression of others.

99.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech activity.

100.    Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

101.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiffs.

102.    Defendants acted pursuant to the custom, policy, and practice of Defendant

Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against

those exercising First Amendment rights. Defendants' retaliation was in accordance with an

informal custom and widespread practice of retaliation in Denver, although not authorized by

written law or express policy, so permanent and well settled as to constitute a custom or usage

with the force of law.

103.    Defendant Denver was aware of widespread retaliation by its law enforcement

officers against those exercising First Amendment rights, as detailed above, and failed to

properly discipline its employees for retaliation.

104.    Defendant Denver knew, or should have known, that its employees would

retaliate against those exercising First Amendment rights and would retaliate in arresting

Plaintiff, violating his constitutional rights.

105.    Defendant Denver's customs and practices condoning its employees' retaliation

were the moving force and proximate cause of the violation to Plaintiff's constitutional

rights.

106.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs

to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Violation**
**Malicious Prosecution**
*Plaintiff Bo Benson Against All Defendants*

107.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

108.    At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law.

109.    Defendants initiated charges against Plaintiff, knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime.

110.    No probable cause supported Plaintiff's original citation and prosecution.

111.    Defendants' motivation was not to bring to justice a person thought to have committed a crime but for the purpose of punishing Plaintiff for engaging in protected speech activity.

112.    Defendants acted with malice in initiating the charges against Plaintiff and his continued prosecution.

113.    The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed under circumstances indicating innocence; thus, the original action against Plaintiff terminated in his favor.

114.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

115.    Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

116.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

117.    As a legal and proximate result of Defendants' actions or omissions described herein, including the unconstitutional custom, policy, or practice of making arrests without probable cause described above from which this malicious prosecution claim arises, Plaintiff has

suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment

of life, and other significant injuries, damages and losses.

### FOURTH CLAIM FOR RELIEF[1]
### C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10
### Freedom of Speech
*Plaintiffs Against Defendants Schaal, Courier, and Allen*

118.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

119.    Defendants acted under color of state law, and within the course and scope of

their employment, in their capacity as law enforcement officers at all times relevant to the

allegations in this Complaint.

120.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local

government and therefore subject to C.R.S. § 13-21-131.

121.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall

be passed impairing the freedom of speech; every person shall be free to speak, write or publish

whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits

and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the

direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

122.    The free speech rights protected by Colo. Const. Art. II, Section 10 are more

expansive than those protected by the First Amendment to the United States Constitution.

123.    Plaintiffs were engaged in protected speech.

124.    Plaintiffs' speech was on a matter of public concern and did not violate any law.

---

[1] Plaintiffs bring these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

125.    Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech rights.

126.    Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiffs' speech.

127.    Plaintiffs' speech occurred at a traditional public forum.

128.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

129.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages.

### FIFTH CLAIM FOR RELIEF[2]
### C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10
### Freedom of Speech – Retaliation
*Plaintiffs Against Defendants Schaal, Courier, and Allen*

130.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

131.    Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer at all times relevant to the allegations in this Complaint.

132.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

133.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish

---

[2] Plaintiffs bring these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits

and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the

direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

134. The free speech rights protected by Colo. Const. Art. II, Section 10 are more

expansive than those protected by the First Amendment to the United States Constitution.

135. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

136. At all times relevant to this Complaint, Defendants were acting under the color of

law.

137. Plaintiffs were engaged in protected speech.

138. Plaintiffs' speech was on a matter of public concern and did not violate any law.

139. Defendants' conduct would chill a person of ordinary firmness from exercising

his or her free speech rights.

140. Defendants' conduct was a content-and/or viewpoint-based restriction on

Plaintiffs' speech.

141. Plaintiffs' speech occurred at a traditional public forum.

142. Defendants responded to Plaintiffs' protected speech activity with retaliation.

143. Defendants' retaliatory actions were substantially motivated by Plaintiffs'

exercise of his free speech rights.

144. Defendants sought to punish Plaintiffs for exercising their free speech rights, to

silence their future speech, to stop them from continuing to speak, and to restrict their freedom of

expression, along with the future speech and expression of others.

145.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech activity.

146.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

147.    Defendants' action and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

**SIXTH CLAIM FOR RELIEF[3]**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 7 & Colo. Const. Art. II, Section 25**
**Malicious Prosecution**
*Plaintiff Bo Benson Against Defendants Schaal, Courier, and Allen*

148.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

149.    Defendants acted under color of state law, and within the course and scope of his employment, in his capacity as a law enforcement officer at all times relevant to the allegations in this Complaint.

150.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

151.    Plaintiff had a protected interest under the Colorado Constitution against being subjected to malicious prosecution.

152.    Defendants initiated charges against Plaintiff, knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime.

---

[3] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

153.    No probable cause supported Plaintiff's original citation and prosecution.

154.    Defendants' motivation was not to bring to justice a person thought to have committed a crime but for the purpose of punishing Plaintiff for engaging in protected speech activity.

155.    Defendants acted with malice in initiating the charges against Plaintiff and his continued prosecution.

156.    The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed under circumstances indicating innocence; thus, the original action against Plaintiff terminated in his favor.

157.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

158.    Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

159.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

160.    As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.  All appropriate relief at law and equity;

b.  Declaratory relief;

c.  Injunctive relief;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

1.  Issuance of a formal written apology from each Defendant to Plaintiff;

2.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

3.  Mandatory training designed to avoid future similar misconduct by Defendants;

h.  Pre-judgment and post-judgment interest at the highest lawful rate;

i.  Attorney's fees and costs; and

j.  Such further relief as justice requires.

## **REQUEST FOR TRIAL BY JURY**

Plaintiffs demand a jury trial on all issues so triable.

Dated this 27th day of June 2023.

       KILLMER, LANE & NEWMAN, LLP

       *s/ Andy McNulty*
       _____
       Andy McNulty
       1543 Champa Street, Suite 400
       Denver, CO 80202
       (303) 571-1000
       (303) 571-1001

       ATTORNEY FOR PLAINTIFFS