# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:23-cv-01637-NRN-PAB

BRENTON BENSON
REGAN BENSON,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, a municipality,
JOHN SCHAAL, in his individual and official capacities,
ZACHARY CURRIER, in his individual and official capacities,
KATIE ALLEN, in her individual and official capacities,
JAMES PELONI, in his individual and official capacities,

      Defendants.

---

## FOURTH AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their counsel, Andy McNulty and Mari Newman of NEWMAN | MCNULTY, hereby submit their Fourth Amended Complaint and Jury Demand, and state as follows:

## <u>INTRODUCTION</u>

1.     Denver Police Department ("DPD") officers retaliated against Plaintiff Brenton Benson and, his wife, Plaintiff Regan Benson because Mrs. Benson was filming their actions, Mrs. Benson is a known critic of the DPD and its response to the homelessness crisis, and both Mr. and Mrs. Benson were critical of them. When Mr. and Mrs. Benson saw multiple DPD officers sitting in their police vehicles in a private parking lot, they pulled over to the side of the road and parked. Mrs. Benson then began filming the officers (Defendants John Schaal, Zachary Currier, and Katie Allen). Because the officers did not appreciate being scrutinized, and because

they wanted to personally retaliate against Mrs. Benson who they knew was a longtime critic of DPD and their response to the homelessness crisis, Defendants Schaal, Currier, and Allen conspired to retaliate against Mr. and Mrs. Benson. They concocted a plan to cite Mr. Benson for blocking the roadway, which was obviously bogus, to intimidate Mr. and Mrs. Benson and punish them for engaging in First Amendment-protected activity. After giving Mr. Benson a bogus citation for allegedly blocking the roadway, the officers left Mr. Benson parked in the exact same spot they claimed was blocking the roadway. This was just the first indication that the only basis for the charges levied against Mr. Benson was retaliation.

2.     At a later court date, a Denver County court judge found that Defendants had no basis to cite Mr. Benson and summarily dismissed the charges against him. Despite the fact that he had been caught red-handed, Defendant Schaal continued his retaliatory actions. Defendant Schaal hid from the judge, and Mr. Benson, that he had placed a formal request to the Colorado Department of Motor Vehicles ("DMV") that Mr. Benson had to undergo a re-test to keep his driver's license. Defendant Schaal did this in consultation with his supervisor, Defendant James Peloni, who encouraged Defendant Schaal to retaliate against Mr. Benson by submitting the formal request. Because Mr. Benson did not know about this hold, his license expired. He later found out that Defendant Schaal took these retaliatory actions and was forced to miss multiple days of work while he sorted out renewal of his driver's license.

3.     This is not the first time that DPD officers have retaliated against individuals for filming and criticizing the police. In fact, DPD has a long, sordid history of violating the First Amendment. And, that is no surprise given that no Defendant was disciplined for their actions here, and Denver officers repeatedly face no repercussions for their violation of Denver citizens

constitutional rights. Plaintiffs bring this action to hold Denver, and its officers, accountable because Denver refuses to do so.

**JURISDICTION AND VENUE**

4.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

5.     Jurisdiction supporting Plaintiffs' claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Fourth Amended Complaint.

7.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

**PARTIES**

8.     At all times relevant to this Fourth Amended Complaint, Plaintiff Brenton Benson was a citizen of the United States of America and a resident of the State of Colorado.

9.     At all times relevant to this Fourth Amended Complaint, Plaintiff Regan Benson was a citizen of the United States of America and a resident of the State of Colorado.

10.     At all times relevant to this Fourth Amended Complaint, Defendant John Schaal was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Schaal was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Schaal is a

peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

11.     At all times relevant to this Fourth Amended Complaint, Defendant Zachary Currier was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Currier was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Currier is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

12.     At all times relevant to this Fourth Amended Complaint, Defendant Katie Allen was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Allen was acting within the scope of her official duties and employment and under color of state law in her capacity as a law enforcement officer for DPD. Defendant Allen is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

13.     At all times relevant to this Fourth Amended Complaint, Defendant James Peloni was a citizen of the United States and resident of the State of Colorado. At all relevant times, Defendant Peloni was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer for DPD. Defendant Peloni is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

14.     Defendants Schaal, Currier, Allen, and Peloni are referred to collectively herein as the "Individual Defendants."

## **FACTUAL ALLEGATIONS**

15.     On August 22, 2021, Mr. and Mrs. Benson were driving near the 800 block of South Huron in Denver, Colorado. Mr. and Mrs. Benson observed three DPD officers who were parked on private property. Both Mr. Benson and Mrs. Benson made the affirmative decision to pull over to the side of the road, and stop, so that Mrs. Benson could film the officers. Mr. Benson stopped his truck on the side of the road. While Mr. Benson stopped his truck, Mrs. Benson pulled out her phone to begin recording the officers and did, in fact, start filming the officers.

16.     Mrs. Benson is a known homelessness advocate in DPD District Four and officers in District Four know who she is because of her advocacy. Ms. Benson has been repeatedly targeted by DPD officers, through arrests, harassment, and intimidation, because she regularly criticizes DPD officers and films them in the performance of their duties. Specifically, DPD District Four officers know Ms. Benson because she continuously interacts with them during homeless sweeps[1] along the South Platte River. Ms. Benson is an outspoken critic of the homeless sweeps and the DPD response to homelessness.

17.     Defendant John Schaal noticed that Mrs. Benson was recording, drove his vehicle up to Mr. Benson's car, and asked if everything was ok. Mrs. Benson responded that she was just checking to see if everything was ok for the officers. Defendant Schaal rudely interrupted Mrs. Benson and snidely told her to have a good day while aggressively pulling away. Defendant Schaal knew who Mrs. Benson was from the moment he drove up to Mr. Benson's vehicle and

---

[1] A sweep is a multi-agency effort by government officials in Denver to displace homeless residents and seize, and destroy, their property. DPD officers generally act as security at the sweeps. *See* Conor McCormick-Cavanaugh, *Coming Clean About The Homeless Sweeps In Denver*, WESTWORD, available at: https://www.westword.com/news/denvers-mayor-hates-the-word-sweeps-denvers-homeless-hate-sweeps-more-11889601.

saw her filming the officers. Defendant Schall associated Mr. Benson as being Mrs. Benson's husband and a supporter of her criticism of the DPD and critic of the homeless sweeps. Mr. Benson's association informed all of his, and Defendants Currier's and Allen's, decisions on August 22, 2021.

18.     Defendant Schaal then pulled back alongside the other officers on the private property. Upon information and belief, Defendant Schaal told the other officers that Mrs. Benson and her husband were filming them. Defendants Schaal, Currier, and Allen began conspiring to try to find a reason to retaliate against Mr. and Mrs. Benson. Defendants Schaal, Currier, and Allen decided that falsely accusing Mr. Benson of being parked illegally and blocking the roadway was the pretext that they would use to issue Mr. Benson a citation in retaliation for his wife's protected First Amendment activity. Defendants Schaal, Currier, and Allen knew who Mrs. Benson was. They saw Mr. Benson with Mrs. Benson and retaliated against him based on his association with Mrs. Benson's filming and her advocacy against homeless sweeps.

19.     After two minutes, Defendant Schaal stepped out of his vehicle and approached Mr. Benson's vehicle. Immediately, Defendant Schaal asked Mr. Benson if there was a reason he was in the middle of the roadway and blocking traffic, despite it being obvious to Defendant Schaal that Mr. Benson was not in the middle of the roadway nor blocking traffic but was instead pulled off to the side of the road. Mr. Benson began to criticize Defendant Schaal and informed him that he was not blocking the street. After Mr. Benson's criticism, Defendant Schaal became more determined to retaliate against Mr. and Mrs. Benson.

20.     Defendant Schaal then told Defendants Currier and Allen that he would be instituting a traffic stop and giving Mr. Benson a citation. Defendants Currier and Allen approached Mr. Benson's vehicle and stood guard as Defendant Schaal interacted with Mr. and

Mrs. Benson. Throughout the interaction, Defendants Currier and Allen maintained a command presence surrounding Mr. Benson's vehicle and made it clear to Mr. and Mrs. Benson that they were not free to leave.

21.     Defendant Schaal took down Mr. Benson's license plate and returned to his vehicle. Once Defendant Schaal returned to his vehicle, he aggressively whipped it around, pulled an illegal U-turn across the roadway, and parked immediately behind Mr. Benson's truck.

22.     After parking behind Mr. Benson's truck, Defendant Schaal approached Mr. Benson and again told him that he was illegally blocking the roadway (which was not true). Mr. Benson was again critical of Defendant Schaal and told him that he was not blocking the roadway. Mr. Benson's criticism irritated Defendant Schaal and Defendant Schaal asked for Mr. Benson's identification, insurance, and registration. Mr. Benson provided all of these things to Defendant Schaal. Defendant Schaal proceeded to write Mr. Benson a citation for allegedly violating D.R.M.C. 54-160 in retaliation for Mr. Benson's criticism and association with his wife. The citation carried with it a $135 fine and Mr. Benson was assessed three points on his driver's license.

23.     While Defendant Schaal was taking all of the above-described actions, Defendants Currier and Allen stood by and did nothing to intervene. Defendants Schaal, Currier, and Allen detained Mr. and Mrs. Benson for approximately twenty minutes and then jointly took action to cite Mr. Benson. All of the Defendants conspired together to violate the rights of Mr. and Mrs. Benson.

24.     After giving Mr. Benson a citation, the officers left the scene. When they left the scene, they did not make Mr. Benson move his vehicle. Given that they allowed Mr. Benson's

vehicle to remain in the roadway, it was clear that his vehicle was not blocking the roadway and that their citation was just a pretextual reason for their retaliation against Mr. and Mrs. Benson.

25.     Later, in retaliation, Defendant Schaal submitted a formal request for re-examination to the Colorado DMV, which he knew would require that Mr. Benson would have to re-take his driver's examination to retain his license. Defendant Schaal purposefully did this without telling Mr. Benson and never told Mr. Benson that he took this action. Defendant Schaal took this action solely because Mr. and Mrs. Benson's First Amendment activity as outlined above.

26.     Defendant Schaal submitted the formal request for re-examination to the Colorado DMV at the urging of his supervisor Defendant James Peloni. Defendant Schaal specifically sought out Defendant Peloni to receive cover for his retaliatory desire to submit the formal request for re-examination to the Colorado DMV. Defendant Schaal described to Defendant Peloni the actions of Mr. and Mrs. Benson. In response, Defendant Peloni encouraged Defendant Schaal to submit the formal request for re-examination to the Colorado DMV. Defendant Peloni told Defendant Schaal that he submits formal requests for re-examination to the Colorado DMV all the time and that driving is a privilege that can be taken away by the police. Upon information and belief, Defendant Peloni routinely used the formal request for re-examination to the Colorado DMV as a tool to retaliate against individuals who were critical of the police. Defendants Schaal and Peloni, jointly, decided to submit the formal request for re-examination to the Colorado DMV to retaliate against Mr. and Mrs. Benson.

**A judge finds Mr. Benson not guilty and that the real reason for his citation was his and Mrs. Benson's speech.**

27.     A few months later, on November 17, 2021, Mr. Benson appeared in Denver County Court to contest his ticket. Defendant Schaal appeared in support of the ticket. During

the hearing both Mr. Benson and Defendant Schaal testified and Denver County Magistrate Judge Catherine Cary presided.

28.     After both parties testified, Judge Cary ruled from the bench. She made a finding that Defendant Schaal used the municipal ordinance as a pretext to retaliate against Mr. and Mrs. Benson. The judge also found that there was no basis for the charges.

29.     The judge went on to find that Mr. Benson was not guilty of impeding traffic in violation of D.R.M.C. 54-160.

**Mr. Benson suffers further damages from the Individual Defendants' retaliatory actions.**

30.     Almost one month later, Mr. Benson was driving on Interstate 70 westbound through Idaho Springs. A state trooper pulled him over for allegedly speeding (this ticket was ultimately dismissed by a Clear Creek County judge in February of 2022). The state trooper that pulled Mr. Benson over informed him that his license had been suspended because of the re-test requirement placed on his license by Defendant Schaal. Mr. Benson was given a ticket not only for speeding, but also for driving under suspension. The state trooper destroyed Mr. Benson's license and Mr. Benson was required to go to the Department of Motor Vehicles to get a new license.

31.     Mr. Benson's ticket for driving under suspension was dismissed after he provided the Clear Creek County Court with a certified copy of his driving record along with his driver's license (which he had to get reinstated). As a result, Mr. Benson lost approximately three days of work.

**Pursuant to its custom and practice, Defendant Denver abjectly failed to discipline Defendants Currier and Allen for their unconstitutional conduct.**

32.     Defendant Denver has imposed no discipline on Defendants Currier and Allen for their unconstitutional actions against Mr. and Mrs. Benson. Defendant Denver, through its inaction, has condoned the conduct of Defendants Currier and Allen.

33.     Based on Denver's custom and practice of tolerating and ratifying such unconstitutional conduct, Defendants Currier and Allen knew prior to violating Mr. and Mrs. Benson's constitutional rights that they would not be disciplined by Defendant Denver for their actions.

34.     Through its failure to supervise and discipline Defendants Currier and Allen, Defendant Denver ratified their unconstitutional actions.

35.     This was not the first time that Defendant Denver condoned its officers' unconstitutional retaliation, particularly through initiation of baseless prosecutions, against individuals who record officers in the performance of their duties.

36.     It was also not the first time that Defendant Denver condoned its officers' unconstitutional retaliation, particularly through initiation of baseless prosecutions, against individuals who criticize police officers.

**Defendant Denver is liable for its officers' violations of Mr. and Mrs. Benson's rights pursuant to its multiple unconstitutional customs and practices.**

37.     All of the acts described herein were done by the Individual Defendants intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Mr. and Mrs. Benson's federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent custom and practice of Defendant Denver.

38.     The Individual Defendants' treatment of Mr. and Mrs. Benson was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to:

a. Retaliating against individuals for engaging in speech activity that is critical of DPD officers;

b. Retaliating against individuals for recording police conduct;

c. Initiating malicious prosecutions in an attempt to cover-up police misconduct; and

d. Failing to discipline officers, or even find officers have engaged in wrongdoing, in the face of obvious unconstitutional actions.

**Defendant Denver failed to adequately supervise its officers.**

39.     Upon information and belief, Defendant Denver has provided no additional training to the Individual Defendants related to the incident with Mr. and Mrs. Benson.

40.     Defendant Denver failed to properly train and/or supervise its employees to avoid inhibiting free speech, the use of excessive force, unlawful seizure, unlawful search, and the initiation of malicious prosecutions.

41.     Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

42.     The other incidents outlined below illustrate an obvious need, of which Defendant Denver was aware at the time of the violation of Mr. and Mrs. Benson's constitutional rights, for Defendant Denver to provide further supervision to its officers on the necessity of not retaliating against individuals who criticize and/or record police officers.

**Denver as an informal custom or practice of condoning unlawful arrests and other acts of retaliation by its officers that is based solely on the exercise of First Amendment rights.**

43.     Denver has a history of retaliating against individuals who record and are critical of police officers—an issue that should have long since been addressed by Denver. A number of previous, similar incidents demonstrate that, at the time of the incident involving Mr. and Mrs. Benson, there was a formal or informal custom and practice, that was known to Denver, of

retaliating against individuals who record police officers, and of condoning this retaliation. The following analogous incidents show that this informal custom and practice was widespread, and that Denver has consciously decided to stop this informal custom and practice from existing within the DPD.

44. Defendant Denver has a longstanding pattern of ratifying its officers' unconstitutional retaliation, through arrests and malicious prosecutions, against individuals who record officers in the performance of their duties and criticize police officers, as detailed below. Because of this longstanding pattern, the Individual Defendants in this case knew that they could unconstitutionally retaliate against Mr. and Mrs. Benson (through their citation of Mr. Benson and baseless prosecution of him) and they would not face any discipline or other consequences from Defendant Denver. This custom and practice of ratifying unconstitutional retaliation was known by the Individual Defendants before they retaliated against Mr. and Mrs. Benson, and caused them to retaliate against Mr. and Mrs. Benson without fear that they would be disciplined by Defendant Denver.

45. Through its continuous ratification of unconstitutional retaliation (which its officers routinely impose through arrests, uses of excessive force, and initiation of baseless prosecutions) against individuals who record officers in the performance of their duties or criticize police officers, Defendant Denver has condoned and ratified the conduct of the Individual Defendants.

46. All of the acts described herein were done by Defendants were intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Plaintiffs' federally protected rights, and were done pursuant to the preexisting and ongoing deliberately

indifferent custom, policy, practice, training, and supervision of Defendant Denver acting under color of state law.

47. Defendants' treatment of Plaintiffs was pursuant to Defendant Denver's customs and/or practices of unlawful conduct, including but not limited to: (1) retaliating against individuals who criticize police officers and (2) retaliating against individuals who film police officers in the performance of their duties. These widespread customs and practices have borne out over the years in repeated retaliation by Denver officers against individuals who film and/or criticize the police with no disciplinary action. This has led to Defendant Denver sending a clear and unequivocal message to its officers that retaliation against those who criticize and/or film the police is acceptable and tolerated by Defendant Denver.

48. The following are examples of Denver police officers violating individuals First and Fourth Amendment rights without repercussion, and of Denver officers engaging in this unconstitutional conduct pursuant to the customs and practices of Defendant Denver.

49. On August 14, 2014, Levi Frasier video-recorded Denver Police Department ("DPD") officers abusing an arrestee from a distance and at a public place. In response, the abusive DPD officers threatened him, took his video-recording device, and deleted the video from it. Luckily, Mr. Frasier was able to recover the video. He subsequently released it to the media. Instead of thanking Mr. Frasier for coming forward to share information about the misconduct of its officers, the DPD released a statement defending its officers' behavior and unfairly attacking Mr. Frasier's character. Then, DPD officers retaliated against Mr. Frasier by seeking him out and arresting him on a few outstanding warrants so as to maliciously prosecute him in retaliation for his speech. Mr. Frasier spent time in jail because the DPD officer's actions. It was clear that the DPD officers were using this as a pretext to retaliate against Mr. Frasier for

filming them. Denver ratified its officers' actions in public. And, it never disciplined its officers for their illegal actions.

50.     On January 26, 2015, DPD officer threatened a witness who was attempting to file the aftermath of the DPD shooting of Jessica Hernandez. That witness tried to video-record the officers' actions in public while she was standing on her own property. DPD officers ordered her not to record. The DPD officers who engaged in this blatantly unconstitutional conduct were not disciplined in any way.

51.     On the morning of May 23, 2018, DPD officers arrested Elijah Wesbrock for using a video camera and mobile phone to record police conduct. After unlawfully arresting him, the DPD officers pushed Mr. Wesbrock against their vehicle and proceeded to illegally search him. After searching Mr. Wesbrock, they forced him into the back of their vehicle. DPD officers arrested and searched Mr. Wesbrock in retaliation for him recording public places. DPD officers then took Mr. Wesbrock to a detox facility despite it being clear that Mr. Wesbrock was not intoxicated. Mr. Wesbrock was held for hours in that facility based on false charges by the DPD officers. Denver never disciplined the officers for their unconstitutional actions. Mr. Wesbrock filed a federal lawsuit and Denver paid Mr. Wesbrok $80,000 to settle his claims.

52.     On July 5, 2018, Susan Greene was driving east on Colfax Avenue on her way to the bank when she saw a Black man, handcuffed and seated naked on the sidewalk across from the State Capitol Building. Several DPD officers stood around the man, who had no clothes on except a towel that covered his private parts. Concerned as both a public citizen and professional journalist, Ms. Greene parked her vehicle and crossed the street – by way of the crosswalk – onto the sidewalk nearby the scene. Ms. Greene stood on the public sidewalk and was not obstructing the police investigation. As Ms. Greene stood on the public sidewalk near the intersection of

Colfax Avenue and Grant Street, out of the way of the officers, she took pictures of the scene with her iPhone. She was quickly stopped by one of the DPD officers who blocked her, got in her face, and told her to stop. Ms. Greene responded that it was a public sidewalk and that she had the right to take photos. The DPD officer told her that she did not. Ms. Green again asserted her First Amendment right to stand on the public sidewalk and take photos, without being in the way of the officers. Shortly thereafter, the DPD officer decided to arrest her. He grabbed Ms. Greene and twisted her arm backwards beyond its normal range of motion, to an excessive degree, causing Ms. Greene instant pain in her arm and shoulder. Another DPD officer then handcuffed Ms. Greene, tightly enough to leave clearly imprinted and red marks on her skin and pushed her toward a nearby police car by grabbing her arm roughly and with a painful upward thrust even though at no point did Ms. Greene resist being handcuffed. One of the officers then seized Ms. Greene's iPhone during her arrest. The officers proceeded to unlawfully search Ms. Greene. The officers put Ms. Greene – handcuffed – into a police car, where she sat for ten minutes before being released. During the encounter, one officer condescendingly told Ms. Greene that she should "act like a lady." No DPD officer was disciplined for their actions in arresting Ms. Greene for recording police activity and her criticism of the police. Denver never disciplined the officers for their unconstitutional retaliation against Ms. Greene. Ms. Greene threatened to file a federal lawsuit and she settled her claims against Denver for $50,000 along with significant non-monetary consideration.

53.     On September 23, 2018, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the

property, and instead, officers arrested her in retaliation for engaging in First Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Ms. Sodaro's arrest was unconstitutional and in retaliation for her engaging in First Amendment protected activity. The officers who unconstitutionally arrested Ms. Sodaro then instituted baseless charges against her to cover-up their unconstitutional retaliation and to punish her for speaking out. Ms. Sodaro spent time in jail because of the DPD officers' actions. Denver never disciplined the officers for their unconstitutional actions.

54. On September 23, 2018, Brian Loma and Mikel Whitney were protesting the police in downtown Denver. During his protest, Mr. Loma shouted, "fuck the police!" Upon hearing these words, DPD officers began contemplating whether Mr. Loma should be arrested for disturbing the peace. When Mr. Loma's shouting and profanity annoyed the sensibilities of a couple dining on a nearby restaurant patio that protrudes onto the public sidewalk, Denver officers used the couples' complaint to, within minutes, arrest and jail Mr. Loma for his protected speech. Mr. Whitney observed Mr. Loma's protest and subsequent arrest. As a concerned citizen and friend of Mr. Loma's, Mr. Whitney took photos of the incident, believing the officers were committing illegal acts in retaliation against Mr. Loma for his protected speech. In his effort to gather information about the officers' misconduct, Mr. Whitney unsuccessfully attempted to take a photo of the complaining couple and their surroundings while standing on a public sidewalk from several yards away. This upset a few Denver officers, who demanded Mr. Whitney not take pictures. Mr. Whitney calmly stated that he did not take a picture and that he was walking away. One officer retorted that Mr. Whitney was indeed going to walk away because the couple was ready to sign a complaint against him as well. As Mr. Whitney walk away, he stated, "I did not take a fucking picture." Upon hearing Mr. Whitney's statement, two

of the Denver officers immediately arrested Mr. Whitney. While arresting him, Defendant Guzman told him to quit swearing. Denver officers unconstitutionally retaliated against Mr. Loma and Mr. Whitney because they were criticizing the police and, Mr. Whitney, because he was taking photographs of them in the performance of their duties. The officers proceeded to unlawfully search Mr. Whitney and Mr. Loma. The officers then instituted a baseless and malicious prosecution of both Mr. Whitney and Mr. Loma to cover-up their unconstitutional actions and to punish them for speaking out. Mr. Whitney and Mr. Loma spent a night in jail because of the unconstitutional actions of the DPD officers. Those charges were dropped by the prosecutor's office because they had no merit. Denver never disciplined the officers for their unconstitutional actions. Mr. Whitney and Mr. Loma filed a federal lawsuit, and they settled their claims against Denver for $128,000.

55.     On September 24, 2018, Eric Brandt was in the Sixteenth Street Mall protesting their arrests. Mr. Brandt stood on a public sidewalk and shouted, "we want justice for Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!" Multiple Denver officers were present and closely watching Mr. Brandt. One officer expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." A woman standing nearby stated that she was offended and would sign a complaint. The officers then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018, because they had no merit and were merely instituted against him to cover-up their retaliatory actions and to punish him for speaking out. Mr. Brandt's arrest was clearly unconstitutional and undertaken in retaliation for him criticizing the police. Denver never

disciplined the officers for their unconstitutional actions. Mr. Brandt filed a federal lawsuit and Mr. Brandt settled his claims against Denver for $65,000.

56.     On July 15, 2019, multiple DPD officers violated the First Amendment rights of Natalie Kantor by retaliating against her for criticizing and recording them in the public performance of their duties. Ms. Kantor was in a car that was pulled over by DPD officers on suspicion that the driver was driving under the influence. DPD officers performed a field sobriety test of the driver then, without warning, attempted to arrest the driver. The officers took him to the ground. When they did, Ms. Kantor exited the car to see what was happening. She then stood on a public sidewalk and criticized the officers' actions and recorded the arrest on her cell phone. For that, DPD officers arrested her. The officers then instituted bogus charges against Ms. Kantor to further retaliate against her and to cover-up their unconstitutional conduct. Ms. Kantor spent a night in jail because of the DPD officers' unconstitutional actions. A jury found Ms. Kantor not guilty of those charges. Despite this, no DPD officer was disciplined for their unconstitutional actions toward Ms. Kantor. Ms. Kantor filed a federal lawsuit and Denver paid $100,000 to settle Ms. Kantor's claims.

57.     On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the plaintiffs' First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the

plaintiffs' First and Fourth Amendment rights and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kinds against persons engaging in peaceful protest. Denver never disciplined the officers for their unconstitutional actions.

58.     On May 28, 2020, Michael Acker, a young black college student, was peacefully protesting in a march that was criticizing DPD officers. At one point during the protest, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask that someone had given him and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a Kinetic Impact Projectile ("KIP") at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. He received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. None of the officers involved were disciplined for their unconstitutional actions. Mr. Acker filed a federal lawsuit and Denver paid Mr. Acker $500,000 to settle his claims.

59.     On May 28, 2020, while he was covering the protests rally at the State Capitol. Hyoung Chang, a credentialed press photographer for *The Denver Post*, was struck two times by pepper-ball rounds fired by law enforcement personnel under the control of the DPD while he was photographing police conduct. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it

was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me.*"* None of the officers involved were disciplined for their unconstitutional actions.

60.	On May 29, 2020, DPD officers shot Gabriel Thorn in the head with a KIP while he was at a protest criticizing DPD officers. Mr. Thorn is a veteran who served in the United States Armed Forces. Several times while Mr. Thorn was attempted to assist other injured people, DPD officers targeted him and shot pepper balls. While at the protest, Mr. Thorn observed a largely peaceful protest but saw DPD officers utilize rubber bullets, tear gas, flash bang grenades, and pepper balls. The protesters were attacked indiscriminately. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. During the protest, Mr. Thorn was struck with pepper balls, rubber bullets, and was tear gassed multiple times. When Mr. Thorn was struck with rubber bullets, as with many others, he was struck in the head. Fortunately, he was wearing a helmet at that time. None of the officers involved were disciplined for their unconstitutional actions.

61.	On May 29, 2020, officer shot Andy Sannier in the chest with a KIP without warning while in downtown Denver during the protests. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was recording them, shot him in the chest with a pepper ball. None of the officers involved were disciplined for their unconstitutional actions.

62.     On May 29, 2020, in the afternoon, DPD officers shot Megan Matthews in the head with a KIP while she was participating in a peaceful protest near the Capitol criticizing DPD officers. When DPD officers shot her in the head, Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance. None of the officers involved were disciplined for their unconstitutional actions. Ms. Matthews filed a federal lawsuit and Denver paid Ms. Matthews $575,000 to settle her claims.

63.     On May 29, 2020, at approximately 8:15 p.m., a credentialed cameraman for KMGH-TV/Channel 7 was struck four times in the chest by KIPs fired by DPD officers while the cameraman was recording police conduct. An additional projectile paint ball hit the front lens of his conspicuous professional-grade video camera, which was at head level. None of the officers involved were disciplined for their unconstitutional actions.

64.     On May 30, 2020, Jeremy Jojola, an on-air correspondent for KUSA-TV/9News was shot with a less-lethal projectile round by DPD officers while standing beside a professional cameraman from that station who was recording police conduct. The round struck Mr. Jojola's backpack. None of the officers involved were disciplined for their unconstitutional actions.

65.     On May 30, 2020, Lindsay Fendt, a freelance reporter and photographer, was standing in a group of press photographers recording police conduct when a DPD officer kicked a pepper gas canister directly into her face. None of the officers involved were disciplined for their unconstitutional actions.

66.     On May 30, 2020, DPD officers shot Michael McDaniel in the head with pepper balls without warning while he attended a protest rally criticizing DPD officers. Mr. McDonald was simply peacefully attending the protest when he was shot without warning. None of the officers involved were disciplined for their unconstitutional actions.

67.     On May 30, 2020, DPD officers shot Elizabeth Epps in the face with a pepper ball without warning while she was attending a protest that criticizing DPD officers. DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face. None of the officers involved were disciplined for their unconstitutional actions. Ms. Epps was awarded $1,000,000 by a jury of her peers for the DPD officers' violation of her First and Fourth Amendment rights.

68.     On May 30, 2020, DPD officers shot Jax Feldmann in the eye with a rubber bullet without warning because they perceived he was attending a protest that was criticizing DPD officers. There were no large groups of protesters nearby when Mr. Feldmann was shot and no one near him yelled at or throw anything at the DPD officers on the truck, which was marked with the DPD logo. His friend called 911 and Mr. Feldmann was transported to Denver Health via ambulance. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye and doctors performed that surgery, however, Mr. Feldmann will never regain his full vision. None of the officers involved were disciplined for their unconstitutional actions.

69.     On May 30, 2020, DPD officers shot former Major League Baseball star Dale Murphy's son in the eye with a pepper ball without warning while he was attending a protest

criticizing DPD officers. After being shot, he was taken to the emergency room. None of the officers involved were disciplined for their unconstitutional actions.

70.     On May 30, 2020, DPD officers without warning shot Russell Strong in the head with a baton round. Mr. Strong was protesting DPD officers near Civic Center Park and carrying a sign that read "No justice, No peace." Shortly after 6 p.m., Mr. Strong was hit in the face with a baton round. The force of the baton round knocked him out. As a result of this use of force, Mr. Strong required several facial reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. When he was shot, Mr. Strong was simply peacefully protesting and was not engaging in any violence or property destruction. None of the officers involved were disciplined for their unconstitutional actions. Mr. Strong filed a federal lawsuit and Denver paid $550,000 to settle Mr. Strong's claims.

71.     On May 30, 2020, Mercii Thomas was shot in the head with a rubber bullet by DPD officers without warning while she attended a protest criticizing DPD officers. Ms. Thomas joined the peaceful protests that had been happening in Denver since the video of the brutal police murder of George Floyd had been released a few days earlier. As Ms. Thomas was protesting, she looked around her and was horrified to see the police firing pepper balls and rubber at protesters who were lying on the ground. She began filming the police violence against peaceful protesters with her phone. As she did so, she observed other people who were recording with their phones being targeted with rubber bullets and pepper balls. It occurred to her that filming the police could be making her a target too. Suddenly, Ms. Thomas felt a massive blow to her forehead. Everything went black as she fell to the ground and lost consciousness. As she regained consciousness, she found herself being picked up and taken to a curb by medics. She

lay on the ground bleeding profusely from her head while the medics worked on applying a tourniquet. Then she felt a sudden burst of pain on her lower back side and realized she had been hit by police again, this time with a pepper ball. Ms. Thomas was terrified, bleeding on the ground, and still police were targeting her with projectiles. She eventually received medical care for her injuries. None of the officers involved were disciplined for their unconstitutional actions. Ms. Thomas filed a federal lawsuit and Denver paid $500,000 to settle Ms. Thomas' claims.

72.     On May 30, 2020, DPD officers shot Darrell Hampton in the face with a pepper ball without warning. Mr. Hampton was peacefully protesting, and filming, DPD officers on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers. None of the officers involved were disciplined for their unconstitutional actions. Mr. Hampton filed a federal lawsuit and Denver paid $175,000 to settle Mr. Hampton's claims.

73.     On May 31, 2020, Gabe Schlough was shot in the face with a rubber bullet by DPD officers without warning while he was attending a protest criticizing DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. Officers were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their face. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so,

covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with rubber bullets. Mr. Slough described the sensation as getting hit with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The rubber bullet had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required twenty-two stitches to close the wound on his chin. He still experiences pain from this wound and required plastic surgery for it to heal properly. None of the officers involved were disciplined for their unconstitutional actions. Mr. Schlough filed a federal lawsuit and Denver paid $575,000 to settle Mr. Schlough's claims.

74.     On May 31, 2020, while attending a protest criticizing DPD officers, Zachary Packard was shot in the head with a KIP by DPD officers without warning. Mr. Packard arrived at the protests on streets surrounding the Capitol at about 8 p.m. DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, Mr. Packard was hit in the head with a projectile shot by DPD officers. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. None of the officers involved were disciplined for their unconstitutional actions. Mr. Packard filed a federal lawsuit and jury awarded Mr. Packard $3,500,000 while finding that Denver officers violated his First and Fourth Amendment rights.

75.     On May 31, 2020, DPD officers shot Youssef Amghar in the head and chest with pepper balls without warning while he attended a protest criticizing DPD officers. Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD and/or APD officers shot them approximately fourteen times. The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Then DPD officers began throwing tear gas canisters at their feet. After a couple minutes, Mx. Amghar walked away and took cover behind a tree. None of the officers involved were disciplined for their unconstitutional actions. Mx. Amghar filed a federal lawsuit and Denver paid $250,000 to settle Mx. Amghar's claims.

76.     On May 31, 2020, Alex Burness of *The Denver Post*, was fired upon, without warning, by DPD officers and shot in the head and abdomen with pepper balls while covering a protest that criticized DPD officers. He sustained a contusion on his head and right abdomen. None of the officers involved were disciplined for their unconstitutional actions.

77.     On May 31, 2020, DPD officers shot Darian Tindall in the chest with pepper balls without warning while attending a protest criticizing DPD officers. Ms. Tindall was hit in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD. None of the officers involved were disciplined for their unconstitutional actions.

78.     On June 1, 2020, DPD officers shot Ambrose Cruz in the head and chest with KIPs without warning while Mr. Cruz was attending a protest criticizing DPD officers. As a photographer and freelance journalist, Mr. Cruz documented the protests as well as the police response. As he was doing so, one DPD officer shot Mr. Cruz in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still has light sensitivity and other problems with his eyesight. None of the officers involved were disciplined for their unconstitutional actions.

79.     On June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Broadcasters Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected to the use of force by DPD officers while filming police conduct in Denver. DPD

officers hit these reporters and with pepper balls, projectiles, or tear gas simply for being present at protests that were criticizing DPD officers and documenting (through filming and photography) their brutal actions.

80.     On June 4, 2020 four persons who participated in the George Floyd protests in Denver sued Denver, alleging that DPD officers' actions violated the First and Fourth Amendments. After a hearing on the matter, Judge R. Brooke Jackson of the United States District Court for the District of Colorado issued a temporary restraining order. In doing so, Judge Jackson reminded the DPD that "people have an absolute right to demonstrate and protest the actions of governmental officials, including police officers. It is one of the many freedoms on which this country was built." In response to the evidence presented, Judge Jackson was unequivocal about the behavior of DPD officers toward protesters who criticized them, calling it "disgusting." Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc.… solely on the basis of their presence at the demonstrations, their viewpoint, or their attempts to render treatment to injured protesters." In the end, Judge Jackson found that DPD officers had targeted "peaceful demonstrators, journalists, and medics… with extreme tactics meant to suppress riots, not to suppress demonstrations."

81.     In the early morning hours of June 12, 2022, DPD officers arrested Zachary Manchas, a veteran, simply because he protested and filmed the arrest of a person of color from a public sidewalk in downtown Denver, Colorado. After unconstitutionally arresting Mr. Manchas,

the DPD officers conspired to prosecute him to further retaliate against him and to cover-up their unlawful arrest of him. Mr. Manchas spent a night in jail because of the DPD officers unconstitutional actions. The charges against Mr. Manchas were ultimately dismissed because they lacked merit. Denver took no action to investigate or discipline the officers that unconstitutionally arrested and initiated the prosecution of Mr. Manchas in retaliation for his exercise of his First Amendment rights.

82.     Almost every one of these representative cases resulted in Defendant Denver paying to significant sums to settle the claims against it for free speech violations, retaliation, and malicious prosecution, yet Defendant Denver failed to discipline its officers for violating the rights of those who criticize and film them. The facts surrounding Mr. and Mrs. Benson's case make apparent that Defendant Denver continues to condone such behavior by its police officers. This custom and practice caused the violation of Mr. and Mrs. Benson's constitutional rights, and Defendant Denver was on notice of this custom and practice based on these past incidents and others, which resulted in litigation and significant payouts by Defendant Denver at taxpayer expense.

**Defendant Denver's unconstitutional customs and practices caused the violation of Mr. and Mrs. Benson's constitutional rights.**

83.     Defendants' unlawful conduct, as set forth in detail herein, was in accordance with the above-described customs and practices condoned and ratified by Defendant Denver that were, even if not authorized by written law or express municipal policy, so permanent and well established as to constitute a custom or usage with the force of law.

84.     Defendant Denver's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of their violation of Mr. and Mrs. Benson's constitutional rights.

85. Defendant Denver's policies, customs, or practices in failing to properly train and/or supervise its employees were the moving force and proximate cause of the violation to Mr. and Mrs. Benson's constitutional rights.

86. The customs, policies, and practices of Defendant Denver of encouraging, condoning, tolerating, and ratifying the retaliation against those who record at public places or criticize public officials, as described herein, was the moving force behind, and proximate cause of, the violation to Mr. and Mrs. Benson's constitutional rights.

87. The actions of Defendant Denver as described herein deprived Mr. and Mrs. Benson of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused her other damages.

88. The acts or omissions of Defendant Denver caused Mr. and Mrs. Benson damages in that she suffered physical and mental pain, among other injuries, damages, and losses.

**Defendant Denver was deliberately indifferent to its unconstitutional customs and practices.**

89. Through Defendant Denver's continuous ratification of its officers' unconstitutional conduct, as described above, Defendant Denver has condoned the conduct of its officers and sent the message that it will not discipline them for violating the Constitution.

90. Defendant Denver knew or had constructive knowledge, based on the customary actions of its officers described above and its condoning of those actions, that its officers would retaliate against those who criticized and/or recorded the police, like Mr. and Mrs. Benson.

91. Defendant Denver could have and should have pursued reasonable methods for prohibiting the widespread customs and practices outlined above, but affirmatively chose not to do so by refusing to discipline its officers who unconstitutionally retaliated against those exercising their First Amendment rights.

92.     Defendant Denver could have and should have pursued reasonable methods for disciplining its officers to make clear that it does not condone such constitutional violations, but failed to do so.

93.     Defendant Denver knew, or should have known, that its employees would retaliate against Mr. and Mrs. Benson for recording police activity and speaking critically of police officers, thereby violating Mr. and Mrs. Benson's constitutional rights.

94.     Defendant Denver was deliberately indifferent to Mr. and Mrs. Benson's constitutional rights, because Defendant Denver knew that individuals in Mr. and Mrs. Benson's position would be at a substantial risk of suffering dangerous consequences from Defendant Denver condoning and establishing the multiple unconstitutional customs and practices outlined above.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation
### Free Speech and Association
*Plaintiffs Against All Defendants*

95.     Plaintiffs hereby incorporate all other paragraphs of this Fourth Amended Complaint as if fully set forth herein.

96.     At all times relevant to this Fourth Amended Complaint, Defendants were acting under the color of law.

97.     Plaintiffs were engaged in protected speech and association.

98.     Plaintiffs' speech was on a matter of public concern and did not violate any law.

99.     Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

100.	Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiffs' speech and/or association.

101.	Plaintiffs' speech and association occurred at a traditional public forum.

102.	Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

103.	Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiffs.

104.	Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

105.	Defendant Denver was aware of widespread retaliation by its law enforcement officers against those exercising First Amendment rights, as detailed above, and failed to properly discipline its employees for retaliation.

106.	Defendant Denver knew, or should have known, that its employees would retaliate against those exercising First Amendment rights and would retaliate against Plaintiffs constitutional rights.

107.	Defendant Denver's customs and practices condoning its employees' retaliation were the moving force and proximate cause of the violation to Plaintiffs' constitutional rights.

108.	Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment**
**Retaliation**
*Plaintiffs Against All Defendants*

109.     Plaintiffs hereby incorporate all other paragraphs of this Fourth Amended

Complaint as if fully set forth herein.

110.     At all times relevant to this Fourth Amended Complaint, Defendants were acting

under the color of law.

111.     Plaintiffs were engaged in protected speech and association.

112.     Plaintiffs' speech was on a matter of public concern. Plaintiffs' association did

not violate any law.

113.     Defendants' conduct would chill a person of ordinary firmness from exercising

his or her free speech and/or association rights.

114.     Defendants' conduct was a content-and/or viewpoint-based restriction on

Plaintiffs' speech and association.

115.     Plaintiffs' speech and association occurred at a traditional public forum.

116.     Defendants responded to Plaintiffs' protected speech and association activity with

retaliation.

117.     Defendants' retaliatory actions were substantially motivated by Plaintiffs'

exercise of their free speech and association rights.

118.     Defendants sought to punish Plaintiffs for exercising their free speech and

association rights, to silence their future speech and association, to stop them from continuing to

speak and associate, and to restrict their freedom of expression and association, along with the

future speech and association of others.

119. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech and association activity.

120. Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

121. Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiffs.

122. Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

123. Defendant Denver was aware of widespread retaliation by its law enforcement officers against those exercising First Amendment rights, as detailed above, and failed to properly discipline its employees for retaliation.

124. Defendant Denver knew, or should have known, that its employees would retaliate against those exercising First Amendment rights and would retaliate against Plaintiffs, violating their constitutional rights.

125. Defendant Denver's customs and practices condoning its employees' retaliation were the moving force and proximate cause of the violation to Plaintiffs' constitutional rights.

126. Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violation**

## Malicious Prosecution
### *Plaintiff Bo Benson Against Defendants Denver, Schaal, Currier, and Allen*

127.     Plaintiff hereby incorporates all other paragraphs of this Fourth Amended Complaint as if fully set forth herein.

128.     At all times relevant to the subject matter of this Fourth Amended Complaint, Defendants were acting under color of state law.

129.     Defendants initiated charges against Plaintiff, knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime.

130.     No probable cause supported Plaintiff's original citation and prosecution.

131.     Defendants' motivation was not to bring to justice a person thought to have committed a crime but for the purpose of punishing Plaintiff for engaging in protected speech activity.

132.     Defendants acted with malice in initiating the charges against Plaintiff and his continued prosecution.

133.     The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed under circumstances indicating innocence; thus, the original action against Plaintiff terminated in his favor.

134.     Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

135.     Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

136.     Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

137.     As a legal and proximate result of Defendants' actions or omissions described

herein, including the unconstitutional custom, policy, or practice of making arrests without

probable cause described above from which this malicious prosecution claim arises, Plaintiff has

suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment

of life, and other significant injuries, damages and losses.

**FOURTH CLAIM FOR RELIEF[2]**
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10**
**Freedom of Speech and Association**
*Plaintiffs Against Individual Defendants*

138.     Plaintiffs hereby incorporate all other paragraphs of this Fourth Amended

Complaint as if fully set forth herein.

139.     Defendants acted under color of state law, and within the course and scope of

their employment, in their capacity as law enforcement officers at all times relevant to the

allegations in this Fourth Amended Complaint.

140.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local

government and therefore subject to C.R.S. § 13-21-131.

141.     The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall

be passed impairing the freedom of speech; every person shall be free to speak, write or publish

whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits

and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the

direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10. This

protects the right to speak and associate.

---

[2] Plaintiffs bring these claims in good faith for the express purpose of extending and/or
modifying existing precedent relating to C.R.S. § 13-21-131.

142. The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

143. Plaintiffs were engaged in protected speech and association.

144. Plaintiffs' speech was on a matter of public concern and did not violate any law.

145. Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

146. Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiffs' speech and association.

147. Plaintiffs' speech and association occurred at a traditional public forum.

148. Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiffs.

149. Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

### FIFTH CLAIM FOR RELIEF[3]
### C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10
### Freedom of Speech and Association – Retaliation
*Plaintiffs Against Individual Defendants*

150. Plaintiffs hereby incorporate all other paragraphs of this Fourth Amended Complaint as if fully set forth herein.

151. Defendants acted under color of state law, and within the course and scope of their employment, in their capacity as a law enforcement officer at all times relevant to the allegations in this Fourth Amended Complaint.

---

[3] Plaintiffs bring these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

152.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

153.     The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10. This protects the right to speak and associate.

154.     The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

155.     Plaintiffs were engaged in protected speech and association.

156.     Plaintiffs' speech was on a matter of public concern and did not violate any law.

157.     Defendants' conduct would chill a person of ordinary firmness from exercising his or her free speech and association rights.

158.     Defendants' conduct was a content-and/or viewpoint-based restriction on Plaintiffs' speech and association.

159.     Plaintiffs' speech and association occurred at a traditional public forum.

160.     Defendants responded to Plaintiffs' protected speech and association activity with retaliation.

161.     Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their free speech and association rights.

162.     Defendants sought to punish Plaintiffs for exercising their free speech and association rights, to silence their future speech and association, to stop them from continuing to

speak and associate, and to restrict their freedom of expression and association, along with the future speech and association of others.

163.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in protected free speech and association activity.

164.    Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiffs.

165.    Defendants' action and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

**SIXTH CLAIM FOR RELIEF[4]**
**C.R.S. § 13-21-131**
**Colo. Const. Art. II, Section 7 & Colo. Const. Art. II, Section 25**
**Malicious Prosecution**
*Plaintiff Bo Benson Against Defendants Schaal, Currier, and Allen*

166.    Plaintiff hereby incorporates all other paragraphs of this Fourth Amended Complaint as if fully set forth herein.

167.    Defendants acted under color of state law, and within the course and scope of his employment, in his capacity as a law enforcement officer at all times relevant to the allegations in this Fourth Amended Complaint.

168.    Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

169.    Plaintiff had a protected interest under the Colorado Constitution against being subjected to malicious prosecution.

---

[4] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

170.     Defendants initiated charges against Plaintiff, knowing that there was no basis for those charges or probable cause to believe Plaintiff had committed any crime.

171.     No probable cause supported Plaintiff's original citation and prosecution.

172.     Defendants' motivation was not to bring to justice a person thought to have committed a crime but for the purpose of punishing Plaintiff for engaging in protected speech activity.

173.     Defendants acted with malice in initiating the charges against Plaintiff and his continued prosecution.

174.     The charges against Plaintiff resulting from the actions/omissions of Defendants described herein were dismissed under circumstances indicating innocence; thus, the original action against Plaintiff terminated in his favor.

175.     Defendants' conduct was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.

176.     Defendants who did not personally initiate the malicious prosecution of Plaintiff failed to intervene to prevent the other Defendants from doing so.

177.     Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

178.     As a legal and proximate result of Defendants' actions or omissions described herein, Plaintiff has suffered and continues to suffer humiliation, lost earnings, emotional distress, loss of enjoyment of life, and other significant injuries, damages and losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to the following:

a.   All appropriate relief at law and equity;

b.   Declaratory relief;

c.   Injunctive relief;

d.   Actual economic damages as established at trial;

e.   Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.   Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.   Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

1.   Issuance of a formal written apology from each Defendant to Plaintiff;

2.   The imposition of policy changes designed to avoid future similar misconduct by Defendants;

3.   Mandatory training designed to avoid future similar misconduct by Defendants;

h.   Pre-judgment and post-judgment interest at the highest lawful rate;

i.   Attorney's fees and costs; and

j.   Such further relief as justice requires.

## REQUEST FOR TRIAL BY JURY

Plaintiffs demand a jury trial on all issues so triable.

Dated this 29th day of November 2023.

NEWMAN | MCNULTY

*s/ Andy McNulty*

_____
Andy McNulty
Mari Newman
1490 N. Lafayette Street
Suite 304
Denver, Colorado 80218
(720) 850-5770
andy@newman-mcnulty.com
mari@newman-mcnulty.com

ATTORNEY FOR PLAINTIFFS